

**NUMBER 13-07-00527-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**SAMUEL RENE GARCIA,**                                     **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                        **Appellee.**

---

**On appeal from the 93rd District Court
of Hidalgo County, Texas.**

---

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Yañez and Garza
### Memorandum Opinion by Justice Garza

Appellant, Samuel Rene Garcia, was convicted of murder, a first-degree felony, and was sentenced to forty-five years in prison. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003). By six issues, Garcia argues on appeal that: (1) the evidence was legally and factually insufficient to support the jury's verdict; (2) the trial court erred in denying his motion for mistrial; (3) the trial court erred in admitting a video recording and photographs of the crime scene; (4) the trial court erred in denying his motion to remove a juror for alleged misconduct; (5) he received ineffective assistance of counsel; and (6) the trial court erred in admitting into evidence a prior judgment of conviction because the State did not

provide reasonable notice pursuant to the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g) (Vernon Supp. 2009). We affirm.

## I. BACKGROUND

On October 12, 2005, Gabriela De Leon was found strangled and burned in her apartment. Garcia was subsequently indicted for her murder. The indictment alleged, in four paragraphs, that Garcia intentionally and knowingly caused the death of De Leon by (1) strangling her with a cable, (2) strangling her with his hand, (3) striking her with his hand or (4) striking her with an unknown object. Garcia admitted to being in De Leon's apartment on the night of her death, but alleged that she was dead upon his arrival. He claimed he panicked because, for some unexplained reason, he knew that his fingerprints would be found on her body. For that reason, he picked up the body, put it in the bedroom closet and set the body and the contents of the closet on fire. He then took the keys to De Leon's car and drove it to a vacant lot in Mission, Texas, where it was later found abandoned. Garcia's theory was that someone else committed the murder. The case was tried to a jury, and Garcia was found guilty of murder and sentenced to forty-five years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice. Garcia then filed a motion for new trial alleging that his trial counsel provided ineffective assistance; the trial court denied the motion. This appeal followed.

## II. THE EVIDENCE

### A. Emergency Personnel and Police Testimony

Vicente Abrigo, a lieutenant with the McAllen Fire Department, testified that he responded to a fire alarm at an apartment complex in McAllen, Texas, at 12:14 p.m. on October 12, 2005. Lieutenant Abrigo discovered De Leon's dead and burnt body in one of the closets of the apartment.[1] Armando Hernandez, a crime scene investigator with the McAllen Police Department, took photographs of the scene and of De Leon's body. The

---

[1] Gilberto Chavero, an arson investigator, testified as an expert witness in arson investigation. He opined that the fire in the closet was started by a match or a lighter.

2

photographs were entered into evidence. Investigator Hernandez observed "some type of either cable cord or some kind of video game cord" wrapped around De Leon's neck several times. He also noticed: a broken artificial nail on the index finger of De Leon's right hand; swelling on the right side of her face and right eye, as if she had been assaulted; abrasions on top of her head; and blood coming out of the side of her mouth. Investigator Hernandez assisted in collecting scrapings from underneath the victim's fingernails. He testified that there was no forced entry into the apartment and that the interior of the apartment was covered with soot.

After Garcia was apprehended, Investigator Hernandez saw "what appeared to be stained blood on [Garcia's] pants and on his shirt[,] . . . scratch marks on his face, scratch marks on the back of the neck and underneath his lip" and "some bleeding or some small lacerations to the tip of his fingers." Hernandez assisted in removing Garcia's clothes by using "pressure point, minimum force which you can use to have the suspect or Defendant comply with your order."[2] A lighter was found hidden in Garcia's buttocks. The officers recovered $13.77 from Garcia's left front pocket and $60.10 from his right front pocket. His wallet was empty. Garcia's entire left hand and two fingers on his right hand were swabbed.

Investigator Hernandez testified that Erik Montemayor Gonzalez was also a person of interest in De Leon's murder. An oral swab was taken from Gonzalez, but Investigator Hernandez did not recommend submitting the swab for comparison and analysis to the Texas Department of Public Safety laboratory.

Heriberto Vigil, a crime scene investigator with the McAllen Police Department, testified that when he arrived at the scene of the crime, De Leon's body was outside of the apartment on an ambulance stretcher. At that time, he preserved the body and conducted

---

[2] Mario Arratia, a crime scene assistant for the McAllen Police Department, also assisted in the removal of Garcia's clothes. Arratia testified that Garcia was very combative and refused to voluntarily remove his clothes.

3

fingernail scrapings and fingerprinting. He observed an X-Box video game cord tightly wrapped around De Leon's neck about four times.

Rene Hernandez, a detective with the McAllen Police Department, was the lead investigator on the case. He arrived at the scene at approximately 1:00 p.m. and observed De Leon's body on the stretcher. Detective Hernandez noted that De Leon was partially burned, her face was swollen, there was blood around her face, and a fingernail was broken. There was no sign of forced entry into the apartment. Detective Hernandez later met with Garcia at the police station. While Garcia was still fully clothed, Detective Hernandez observed scratches on Garcia's face and neck area, blood on his pants and hands, and noticed that he smelled of smoke. Detective Hernandez also interviewed Gonzalez, who came in to the station of his own volition. Gonzalez was cooperative and permitted the detective to look for scratches; none were found.

Mario Cavazos, a detective with the McAllen Police Department, testified that De Leon's vehicle was located in a vacant lot near the Cimarron golf course in Mission. After being assigned to locate Garcia, Detective Cavazos interviewed Janell Garcia, Garcia's wife, who advised him that Garcia was at a nearby Wal-Mart. When Detective Cavazos arrived at the Wal-Mart, he saw Garcia pacing in front of the store. Detective Cavazos apprehended Garcia and immediately smelled smoke on his person. He saw smoke residue around Garcia's ears and neck and scratches on his face and neck.

Investigator David Ramos of the McAllen Police Department testified that he was assigned to contact and canvas the area for witnesses. As part of his duties, Investigator Ramos obtained De Leon's cell phone records. The records revealed outgoing calls to a "Mr. Islas" at 3:06 a.m., and two calls to a "Mrs. Briales" at 3:08 a.m.[3] Prior to that, there

---

[3] Adelita Briales testified that she received two calls on her cell phone at approximately 3:00 a.m. on October 12, 2005. The caller sounded like a young man with a "thick, like a rough kind of voice." Briales told the caller both times that he had the wrong number. She could not recall the name of the person that the caller was asking for. Tiburcio Islas Jr. testified that he received a "private" call on his cell phone at approximately 3:00 a.m. on October 12, 2005, but that he did not answer the call.

4

were six incoming calls from De Leon's sister, Claudia.  There were no calls made after 3:08 a.m.

**B.    Claudia De Leon**

Claudia De Leon is the victim's older sister.  She had worked until approximately 2:00 a.m. that day and came to De Leon's apartment around 2:25 a.m.  At that time, Garcia was in the restroom.  According to Claudia, Garcia opened the restroom door, looked out, didn't say anything, and then returned to the restroom.  While Garcia was in the restroom, Claudia and De Leon talked about how Claudia had just been paid $200 at work.  De Leon mentioned that she had approximately $100 in cash that she was saving up to pay her electric bill.  About ten minutes later, Garcia came out of the restroom.  Claudia stated that she spoke with Garcia and observed his face—she noticed a pimple on his nose but did not see any scratches or stains on his clothes.  Claudia and De Leon left the apartment around 2:40 a.m. to go to a nearby convenience store.  At that point, De Leon told Garcia to leave.  However, as she drove away from the parking lot with her sister, Claudia did not see Garcia walking or driving away.

Later that day, Claudia's mother received a call from police asking for De Leon because her car had been located in Mission.  Because De Leon was not answering her cell phone, Claudia decided to go to her apartment.  Claudia arrived at the apartment around 11:00 a.m. to find the door unlocked.  When she opened the door, smoke came out.  She sought help from a neighbor.

Claudia was asked to review the photographs of Garcia that were taken at the police station.  She testified that the scratch marks on Garcia's face and neck were not present when she saw him at the apartment in the early hours of that morning.  She also testified that De Leon was wearing earrings and that her fingernails were intact when she last saw her alive that morning.

**C.    Janell Garcia**

Janell was married to Garcia from 1995 to 2006.  She and her children were living

with her mother in 2005. Although they were separated, she and Garcia talked every other day. Janell was employed as a detention officer with the McAllen Police Department and used the only car that she and Garcia owned. Janell testified that Garcia did not have his own car or his own place to stay.

On October 11, 2005, Janell received a call from Garcia around 7:15 a.m., asking her to pick him up and take him to a Wal-Mart "because he was expecting to get some money from his sister at the money gram there at Wal-Mart." Janell complied. When Garcia came out of the Wal-Mart, he said the money he was expecting had not been sent, and he stated that he needed money to rent a hotel room. Janell next took Garcia to an apartment complex to see someone that supposedly owed Garcia ten dollars; but that person was not home. Janell then withdrew sixty dollars from an ATM, gave Garcia forty-five dollars, and dropped him off at a different apartment complex. Later that afternoon, she picked him up again and they went to their son's football game. When the game ended around 7:45 p.m., Garcia asked Janell to take him to the McAllen Police Department so he could turn himself in for some outstanding tickets, thinking he could "do some time there" since he didn't have a place to stay. Janell complied with his request. Garcia called again at around 10:00 p.m. and asked Janell to pick him up at a Burger King and drop him off at the Mint Club where he worked as a bouncer.

On October 12, 2005, at approximately 4:00 p.m., Garcia called Janell asking her to pick him up at the Wal-Mart off of Shary Road in Mission. By that time, investigators had advised Janell that they were looking for her husband. Janell told the investigators the location from where Garcia had called. The next day, Garcia called Janell as he was being transported to the county jail. He told her not to let the kids watch the news and asked her to call his attorney. She testified his voice was normal and that he did not sound worried, nervous, or emotional.

## D. Forensic Evidence

Jose Zuniga, a forensic scientist with the Texas Department of Public Safety Crime

6

Laboratory, was asked to screen toothpicks with fingernail scrapings taken from De Leon and to perform a fiber comparison, if necessary. According to Zuniga, "fibers that were recovered from the fingernail scrapings can be excluded as having originated from the blue Polo shirt and the Old Navy jeans" that Garcia was wearing on the night in question.

Crystal Anderson, a forensic scientist with the serology DNA section of the Texas Department of Public Safety Crime Laboratory, testified that she processes evidence for the presence of body fluids and then develops DNA profiles from any stains that are found. In this case, Anderson examined the toothpicks with scrapings taken from De Leon's fingernails, some socks, Garcia's shirt, jeans, and boots, and Garcia's hand swabs. Anderson found blood stains in one sock; no blood on the boots; several apparent blood stains on the blue shirt and blue jeans worn by Garcia; and apparent blood on the hand swabs.

Anderson conducted DNA analysis on the toothpicks with De Leon's fingernail scrapings. Garcia was excluded from both the right-hand and left-hand fingernail scrapings. The fingernail scrapings from De Leon's right hand were consistent with her own DNA. The fingernail scrapings from De Leon's left hand were consistent with a mixture of her DNA and that of an unknown individual. The hand swabs from Garcia's right and left hand were consistent with his own DNA. A stain from the shoulder area of the shirt Garcia was wearing was consistent with a mixture of DNA from Garcia and De Leon. De Leon was excluded from a stain located on another area of the shirt. Of the three socks that were tested, apparent blood was detected on two of the socks; on those two socks, the DNA profile developed from all four stains were consistent with De Leon. The DNA profile obtained from a stain from the front hip area of Garcia's jeans was consistent with a mixture of DNA from Garcia, De Leon, and an unknown individual.

Fulgencio Salinas, M.D., a pathologist, performed an autopsy on De Leon on October 12, 2005. Dr. Salinas examined De Leon's body and observed: abrasions on the front portion of her forehead; swollen eyelids; a hemorrhage or congestion along her

7

eyelids; areas of hemorrhaging around the conjunctiva, or inside white of the eyes, which is usually caused by asphyxia or irritation; a cord wrapped around her neck three or four times, causing compression around the neck area; and extensive burns on her body. An internal examination of De Leon's head showed several hematomas, which, according to Dr. Salinas, is a collection of blood that occurs in the soft tissues and is caused by some type of blunt trauma. Hematomas were also found on the inside of both lips. De Leon's brain showed a diffuse subarachnoid hemorrhage, which is caused by trauma or injury to that area. When Dr. Salinas opened up her larynx, no soot was present, which suggested that De Leon was not alive during the fire. There were no fractures in the throat. Dr. Salinas opined that "De Leon died as a result of asphyxia by strangulation and multiple head trauma that led to the diffuse subarachnoid hemorrhage head trauma and cerebral edema." In this case, he testified, it was the cord that was wrapped around her neck that resulted in the asphyxia. A second possible cause of death, according to Dr. Salinas, was multiple head trauma. The fire did not cause De Leon's death.

**E.    Alex Alvarez**

Alex Alvarez, an officer with the McAllen Police Department, stated that he transported Garcia from the police department to the Hidalgo County Jail on October 14, 2005. At some point, Garcia asked to use Officer Alvarez's cell phone to call his wife. Officer Alvarez dialed the number and held up the phone for Garcia to talk. While speaking on the phone, Garcia was crying and

> saying he was sorry. He was asking her to go on with her life. He asked her to find someone that would give her anything that she wished for. He said that he was sorry and that he would rather put a bullet in his head instead of going to jail. He referred to this experience as maybe it was a sign from God because he was tired of living the kind of life he was living.

According to Officer Alvarez, Garcia then said, "I'm sorry, Baby, but they said I killed this girl and I swear I didn't." After Garcia ended the telephone conversation, he became very emotional and began crying. Officer Alvarez testified that Garcia

> began by saying, "I panicked. I panicked." He was crying, and he kept

8

saying he panicked. And he said he went inside the house, saw her dead and he panicked. So he just picked her up, threw her in the closet and lit her up. As he's saying this, he's crying. . . . He kept saying that, you know, "I knew they were going to find my fingerprints on her body. So, that's why I put her in the closet and burned her."

. . . .

He said that he knew that they were going to find her blood on his clothes and so that's why the investigators had kept them. . . . He said he had taken the car—the car keys from the table and driven the car to the Cimarron [sic] where he left it and then began to walk.

On cross-examination, Alvarez acknowledged that, while Garcia did admit to burning De Leon's body, he did not admit to killing her.

### III. Discussion

**A.     Evidentiary Sufficiency**

By his first issue, Garcia argues that the evidence at trial was legally and factually insufficient to support his conviction.[4] Specifically, Garcia argues the evidence was (1) factually insufficient to show he was the person that caused the death of the victim, and (2) legally and factually insufficient as to the cause of death.

In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). We must give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). We are not required to determine whether we believe that the evidence at trial established guilt beyond a reasonable doubt; rather, when faced with conflicting evidence, we must

---

[4] In his brief on appeal, Garcia states as part of his first issue that "there was insufficient evidence to submit paragraph two, strangling the victim with his hand, as a potential manner and means of causing the death of the victim." However, Garcia provides no argument or citation to authority or to the record in support of this bare statement. Accordingly, to the extent that Garcia intended to raise this as an issue on appeal, it is waived. *See* TEX. R. APP. P. 38.1(i).

9

presume that the trier of fact resolved any such conflict in favor of the prosecution, and we must defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

In conducting a factual sufficiency review, we consider the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). The verdict will be set aside only if (1) it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, or (2) it is against the great weight and preponderance of the evidence. *Id.* at 415 (citing *Johnson v. State*, 23 S.W.3d 1, 10 (Tex. Crim. App. 2000)).

The State is not required to present direct evidence, such as eyewitness testimony, to establish guilt. *See Guevara v. State,* 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Circumstantial evidence is as probative as direct evidence in establishing guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper,* 214 S.W.3d at 13; *see Guevara*, 152 S.W.3d at 49. The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *see Guevara*, 152 S.W.3d at 49.

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Under a hypothetically correct jury charge, Garcia committed the offense of murder if he (1) intentionally or knowingly (2) caused De Leon's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). A person acts intentionally with respect to a result of his conduct when it is his conscious objective to cause the result. *Id.* § 6.03(a) (Vernon 2003). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). Intent may "be inferred from circumstantial evidence[,] such as acts, words, and the conduct of the appellant." *Guevara,* 152 S.W.3d at 50; *see also Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App.

10

2002) (stating that a fact-finder may infer both knowledge and intent from the defendant's acts, words, or conduct and from the nature of the wounds inflicted on the victim); *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984) (noting that the requisite culpable mental state may be inferred from the surrounding circumstances).

### 1. Factual Sufficiency of Evidence that Garcia Caused De Leon's Death

Garcia claims the evidence is sufficient only to show that he was present at the scene of the murder. To this end, he admits that he was present, but claims that De Leon was dead upon his arrival. He claims he panicked and lit the body and the apartment on fire to destroy evidence of his fingerprints. Garcia argues there is no controverting evidence.

Additionally, Garcia argues that the fact that De Leon's DNA was on his clothing establishes only that he had contact with her at some point in time; something to which he admits. Further, Garcia notes that Dr. Salinas was not able to say when De Leon died and whether Garcia was around her at the time of death. Garcia argues that, through cross-examination of the officers, he established that the scratches and red marks on his face and neck could have been caused by the police officers when they were forcibly removing his clothes. Finally, Garcia argues, "the proposition that the victim caused the scratch marks on the Defendant was not plausible because the State's experts concluded that the DNA found under the victim's fingernails were from an unknown individual."

While there is no evidence to controvert Garcia's claim that De Leon was dead when he arrived at the apartment, the jury was free to determine the credibility of Garcia's story. It is the jury's sole responsibility to judge the credibility of witnesses, and the jury is free to believe or disbelieve any portion of a witness's testimony. *Cain v. State*, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997); *Ortega v. State*, 207 S.W.3d 911, 920 (Tex. App.–Corpus Christi 2006, no pet.). In addition to Garcia's claim, the jury also heard Claudia's testimony that Garcia was present at the apartment a short time before De Leon returned to her apartment at approximately 3:00 a.m. The jury heard testimony that calls were made from

11

De Leon's cell phone by a male at 3:06 and 3:08 a.m. They learned that Garcia had been desperately looking for money earlier that day because he had no place to stay. Claudia testified that she and her sister were talking about money that De Leon had in the apartment while Garcia was in the restroom.

The fact that De Leon's DNA was found on Garcia's clothing is equally probative of his murdering her as it is to his claim that he simply made contact with her. The jury could have believed that the blood of De Leon, found on Garcia's shirt and pants, resulted from the process of him killing her rather than from him merely picking her up and putting her in the closet. Dr. Salinas testified there was no soot in De Leon's throat, which indicated that she died prior to the fire. The jury could have believed that Garcia killed her first, by strangling her with the X-Box cord, and that he then placed her in the closet before setting her body and the other contents of the closet on fire. This would be consistent with the testimony of Dr. Salinas. Although Garcia established that the scratches and red marks on his face and neck may have been caused by the officers as his clothes were being forcibly removed, the jury also heard the testimony of Detective Hernandez, who saw the scratch marks prior to Garcia's clothes being removed.

Finally, Garcia asserts that it is not "plausible" that De Leon caused the scratch marks on Garcia's face and neck, because Garcia's DNA was not found underneath De Leon's fingernails. However, Garcia presented no testimony, expert or otherwise, indicating that the lack of his DNA under De Leon's fingernails conclusively established that the scratches were not made by De Leon. Without such testimony, the jury was free to weigh the evidence and resolve any conflict therein. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we must presume that the fact[-]finder resolved the conflicts in favor of the prosecution and therefore defer to that determination.") (citing *Jackson*, 443 U.S. at 326).

Considering all of the evidence in a neutral light, we cannot say that the verdict was clearly wrong, manifestly unjust, or against the great weight and preponderance of the

12

evidence. *See Watson*, 204 S.W.3d at 415. Therefore, the evidence was factually sufficient to support the jury's finding that Garcia caused the death of De Leon.

**2.      Legal and Factual Sufficiency of Evidence of De Leon's Cause of Death**

Garcia next argues that the testimony of Dr. Salinas regarding the cause of De Leon's death was legally and factually insufficient to support the guilty verdict. First, Garcia criticizes Dr. Salinas for not stating that the blunt trauma he observed on De Leon's body was "severe." He further complains that Dr. Salinas did not testify as to an approximate time frame during which this trauma occurred. Garcia states that "[t]he doctor failed to provide this essential information to the jury wherein they would be able to make a rational decision based on competent evidence."

Dr. Salinas testified that he observed several hematomas in the interior of De Leon's head and on the inside of both of her lips. Her brain showed a diffuse subarachnoid hemorrhage. While Dr. Salinas may not have used the word "severe," he testified the hematomas and hemorrhage were caused by blunt force trauma. Implicit in this conclusion is the notion that the trauma was severe enough to cause these hematomas and hemorrhage. As to the time frame, it is true that Dr. Salinas did not testify as to when the trauma may have occurred. Garcia argues "the trauma he observed may have been caused one week before the death of the victim from some unrelated matter." However, there was no evidence at trial to support this contention.

Garcia further complains that Dr. Salinas was unable to pinpoint the time of De Leon's death and that he "vacillate[d]" regarding the cause of death. Dr. Salinas opined that "De Leon died as a result of asphyxia by strangulation and multiple head trauma that led to the diffuse subarachnoid hemorrhage head trauma and cerebral edema." In this case, he testified, it was the cord that was wrapped around her neck that resulted in the asphyxia. A second possible cause of death, according to Dr. Salinas, was multiple head trauma. The jury heard evidence that De Leon was alive at approximately 3:00 a.m. on October 12, 2005, and that she was found dead at around noon of that day. The jury was

13

able to infer that De Leon died within that time frame. Garcia does not demonstrate how the lack of a precise estimate as to time of death renders the opinion of Dr. Salinas insufficient or incapable of being considered by the jury.

Finally, Garcia argues "Dr. Salinas never offered any reasonable medical explanation of how he was able to arrive at his opinions. He did not offer nor reveal the underlying scientific or medical bases for arriving at such conclusions regarding the cause of death." In support of this argument, Garcia notably cites case law and rules of evidence regarding admissibility of scientific evidence. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992); TEX. R. EVID. 702. To the extent that Garcia is arguing that Dr. Salinas's testimony was inadmissible, we note that an objection at trial is required in order to preserve an appellate complaint that expert testimony was wrongly admitted. *See* TEX. R. APP. P. 33.1. Garcia's counsel did not object to Dr. Salinas being called as an expert in the area of forensic pathology. In fact, prior to the State offering Dr. Salinas as an expert, Garcia's counsel asked to take him on voir dire and ask questions of him. Upon completion of his questioning, defense counsel said, "we defer to the court." Garcia's counsel did not object when the State offered Dr. Salinas as an expert or when Dr. Salinas expressed his opinions. Accordingly, this complaint is not preserved for our review. *See id.*

We conclude that the evidence regarding De Leon's cause of death was legally and factually sufficient. Garcia's first issue is overruled.

**B.      Denial of Motion for Mistrial**

By his second issue, Garcia contends that the trial court committed reversible error when it denied his motion for mistrial after the State elicited testimony of Garcia's criminal history during the guilt/innocence phase of the trial. Garcia complains specifically of the following testimony by Officer Cavazos:

> [Prosecutor]:      And at that point, were you given a particular assignment?

14

[Officer Cavazos]:   Yes.  Well, we learned that the possible suspect in this case was Mr. Garcia.  And I was provided with a mug shot photo, and I was informed by fellow investigators that—of his criminal history and—

[Defense counsel]:   Judge, may we approach?

The Court:   Yes, you may.

At this point, a discussion was held off the record.  Thereafter, questioning by the State and cross-examination by defense counsel continued and was completed without any further reference to Garcia's criminal history.  The jury was excused.  Defense counsel then asked Officer Cavazos about his earlier testimony regarding Garcia's criminal history.

[Defense counsel]:   What did you mean to imply by that?

[Officer Cavazos]:   I didn't mean to imply anything other than we had a better understanding of his character.

        . . . .

[Defense counsel]:   So, you meant to imply to the ladies and gentlemen of the jury that you had a better understanding of his character because of his criminal history?

[Officer Cavazos]:   Yes.

[Defense counsel]:   And what was his character that you were trying to imply?

[Officer Cavazos]:   That he had been the suspect of a violent crime.

Officer Cavazos was excused and defense counsel moved for mistrial.  Defense counsel acknowledged that Officer Cavazos's original answer was non-responsive and was not intentionally elicited by the State.  Nonetheless, he noted that Garcia's criminal history and the suggestion of a violent nature was made known to the jury.  Defense counsel then stated:

> I'm somewhat in a precarious position because I didn't object formally for the record.  Although, I approached the Court—and I don't know if our bench conference was taken or not.  In that bench conference, I complained; and from a safeguarding standpoint, I didn't object because sometimes it brings more light to the issue that [sic] if you don't object and just approach.  But nonetheless, we think there's information out there that the ladies and gentlemen of the jury now have that this defendant somehow has a criminal

15

history, and that is the reason they proceeded to arrest him at the Wal-Mart in the manner that they did.

The trial court denied the motion for mistrial. On appeal, counsel for Garcia argues that Officer Cavazos violated an agreed order in limine which requested to exclude all evidence of extraneous crimes or misconduct. Garcia also argues that Officer Cavazos's testimony amounted to inadmissible character evidence. *See* TEX. R. EVID. 404.

During the hearing on the motion for mistrial, Officer Cavazos acknowledged that prosecutors told him not to talk about Garcia's violent history in front of the jury. Officer Cavazos explained his earlier testimony as follows:

| [Prosecutor]: | Okay. We did talk that you can't tell the jury he has a violent history; is that right? |
|---|---|
| [Officer Cavazos]: | Right. |
| [Prosecutor]: | But the reason you all acted the way that you did was based on the information that you had before you went over there; is that correct? |
| [Officer Cavazos]: | That's correct, sir. |
| [Prosecutor]: | And so, when you say you were trying to imply to the jury what you knew about him, are you saying that you knew things other—you knew things about him other than his photograph that caused you all to take the actions that you did? |
| [Officer Cavazos]: | That's correct, sir. |
| [Prosecutor]: | But you didn't—you knew there were limits on what you could say in front of the jury; is that right? |
| [Officer Cavazos]: | Yes, sir. |
| [Prosecutor]: | And were you trying to tell—I mean, were you trying to put in front of the jury that this man had been arrested before? |
| [Officer Cavazos]: | No. Really, I wasn't. It was for our own safety, you know, for us to be better aware of what we were dealing with. |
| [Prosecutor]: | Okay. That was—you all gather that information to protect yourself and to protect the public and everything like that— |

[Officer Cavazos]:   Exactly.

[Prosecutor]:          —in making the arrest?

[Officer Cavazos]:   Yes, sir.

Garcia acknowledges that his trial counsel did not object at the time the testimony was offered. *See* TEX. R. APP. P. 33.1(a). Nevertheless, he argues that an opposing party has a duty to comply with the order in limine and to instruct the witnesses to do the same. *Heidelberg v. State*, 36 S.W.3d 668, 673 (Tex. App.–Houston [14th Dist.] 2001, no pet.). Citing *Harnett v. State*, 38 S.W.3d 650, 655 (Tex. App.–Austin 2000, pet ref'd.), Garcia notes that non-compliance with an order in limine may lead to contempt or other sanctions the trial court deems appropriate. While this proposition is accurate, we note that, even if there has been a violation of the order in limine, it is still incumbent upon a party to object to the admission or exclusion of evidence in order to preserve error for appeal. *Id.* Because Garcia did not timely object to Officer Cavazos's testimony regarding his prior conviction, he has not preserved the issue for our review. *See* TEX. R. APP. P. 33.1

Garcia also complains that the trial court should have instructed the jury to disregard the statement—otherwise, according to Garcia, the jury may have considered Garcia's criminal history as evidence against him. Once again, however, Garcia has not preserved his complaint for appeal. In order to preserve error, a defendant must make a timely objection, and, if the objection is sustained by the court, the defendant must request a curative jury instruction and must seek a mistrial if the curative instruction is given. *Id.*; *see Nethery v. State*, 692 S.W.2d 686, 701 (Tex. Crim. App. 1985); *Duran v. State*, 505 S.W.2d 863, 866 (Tex. Crim. App. 1974); *see also Heidelberg*, 36 S.W.3d at 672-73 ("If the objection is sustained, the defendant must move to strike the evidence, that is, to have it removed from the body of the evidence the jury is allowed to consider."). Here, Garcia did not object to the testimony or ask for a curative jury instruction to disregard the allegedly improper testimony. Accordingly, Garcia failed to preserve this complaint for review. We overrule Garcia's second issue.

17

**C.    Admissibility of Crime Scene Videotape and Photographs**

During the guilt/innocence phase of trial, the State offered into evidence a video recording depicting the crime scene as well as numerous photographs of the victim. Due to the gruesome nature of the evidence, Garcia objected to the admissibility of the videotape and certain photographs, claiming that the probative value of the evidence was substantially outweighed by its prejudicial effect. *See* Tex. R. Evid. 403. The trial court overruled the objections. Garcia challenges this ruling by his third issue on appeal.

When determining whether the trial court erred in admitting relevant photographs into evidence, our review is limited to determining whether the probative value of the photos is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. *See id.*; *Young v. State*, 283 S.W.3d 854, 874 (Tex. Crim. App. 2009); *Long v. State*, 823 S.W.2d 259, 271 (Tex. Crim. App. 1991); *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (op. on reh'g). The probative value of a color photograph or a video recording depicting the recovery of a murder victim's body may outweigh its prejudicial effect even when the depiction includes close-ups and lingering camera angles, so long as the images simply reflect the gruesomeness of the offense. *Ripkowski v. State*, 61 S.W.3d 378, 392 (Tex. Crim. App. 2001). The trial court's decision is reviewed under an abuse of discretion standard and may be disturbed on appeal only when falling outside the zone of reasonable disagreement. *Montgomery*, 810 S.W.2d at 391.

A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or naked. *Young*, 283 S.W.3d at 874. A court, however, should

18

not be limited by this list; the availability of other means of proof and the circumstances unique to each individual case should also be considered. *Id.*

The video recording at issue here shows De Leon's body as it is being removed from the apartment. According to Garcia, the video shows an "unclothed cadaver showing its breasts and genitalia." Garcia argues there was no probative value in showing the body "in a very gruesome state, burnt and with images of the breasts and genitalia." He further claims there was no need to introduce the video because "all of this imagery could have been and was testified to by the officers who were present at the crime scene."

The photographs depict similar images as shown on the video recording. According to Garcia, showing a "badly charred body with exposed genitals," "close up views of the burnt body," "the burnt body with the breasts exposed and the victim's face staring at the camera," "a close up view of the body showing the exposed breasts and the face," "an extreme close up of the burnt face of the victim," and "the unclothed victim from her waist down, showing her exposed genitals" was more prejudicial than probative. *See* TEX. R. EVID. 403. He argues, once again, that "the testimony of numerous officers regarding the location and condition of the body was sufficient."[5]

We discern no abuse of discretion in the admission of the video recording and photographs in question. They were all probative of the manner of De Leon's death, and the manner in which Garcia attempted to destroy evidence of his fingerprints on her body. *See Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999). The videotape and photographs are relevant because they accurately reflect the location and state of the body when it was discovered and the injuries inflicted on it. *See Ripkowski*, 61 S.W.3d at 392; *see also McGhee v. State*, No. 01-09-00147-CR, 2010 Tex. App. LEXIS 5561, at *16 (Tex. App.–Houston [1st Dist.] July 15, 2010, no pet. h.) (mem. op., not designated for

---

[5] At trial, the specific objections lodged were "that the substance of these exhibits, their probative value is outweighed by the prejudicial effect, they're cumulative, repetitive, duplicitous, and are intended to inflame and create sympathy with the jury."

19

publication). They support the testimony that De Leon was strangled with a cable cord and burned. *See Ripkowski*, 61 S.W.3d at 392.

While the images portrayed may be gruesome, they depict nothing more than the reality of the brutal crime committed and its aftermath. *See Paredes v. State*, 129 S.W.3d 530 (Tex. Crim. App. 2004). Photographs are not rendered inadmissible merely because they are gruesome or might tend to arouse the passions of the jury, unless they are offered solely for the purpose of inflaming the minds of the jury. *Potter v. State*, 74 S.W.3d 105, 112 (Tex. App.–Waco 2002, no pet.); *Ward v. State*, 787 S.W.2d 116, 120 (Tex. App.–Corpus Christi 1990, pet. ref'd). While the crime scene video recording and photographs do make an indelible impression, they do not depict more than the nature of the crime. *See Ripkowski*, 61 S.W.3d at 392. Further, although the videotape and photographs may have been partially cumulative of other evidence, the trial court could have reasonably concluded that the probative value of the evidence was not substantially outweighed by its tendency to prolong the trial. *See Ladd*, 3 S.W.3d at 568. We conclude that the trial court did not abuse its discretion in admitting the photographs and video recording into evidence. Garcia's third issue is overruled.

## D. Denial of Motion to Remove Juror

By his fourth issue, Garcia asserts that the trial court erred in denying his request to remove a juror. During trial, defense counsel informed the trial court that juror number five had engaged in a conversation with a witness, Detective Hernandez. Outside the presence of the jury, defense counsel asked Hernandez whether he had any contact with the jurors. Detective Hernandez responded as follows:

A. [Detective Hernandez]  Any contact with the jurors? I said hi to a relative of mine.

Q. [Defense counsel]  Did you just waive [sic] hi, or did you have a verbal discussion with her?

A.  She came up and said hi to me.

20

Q.                          What was discussed or what was said?  Tell us what was actually said.

A.                          She asked how my baby was, and I said, "She is fine.  How is yours?"  And that was the extent of it.

Q.                          You didn't mention to her, "I'll talk to you later on or after this case," or "I'll talk to you in a bit"?  You didn't mention anything like that?

A.                          I told her that we would talk after this trial was done.

Q.                          Anything else that was said other than that?

A.                          That was it.

At the close of its case-in-chief, defense counsel objected to juror number five and asked that the court "exercise its discretion" to determine whether the conversation that took place rose to the level of juror misconduct resulting in prejudice to Garcia.[6]  The trial court found that the conversation did not "rise to the level of prejudice" and ruled that the juror remain.

When a juror converses with an unauthorized person, injury is presumed.  *Green v. State*, 840 S.W.2d 394, 406 (Tex. Crim. App. 1992).  However, the presumption is rebuttable; if it is shown that the case was not discussed or that nothing prejudicial to the accused was said, then appellant has not been injured and the verdict will be upheld.  *Id.* We defer to the trial court's resolution of historical facts and its determinations concerning credibility and demeanor, and we view the evidence in the light most favorable to the trial court's ruling.  *Quinn v. State*, 958 S.W.2d 395, 401-02 (Tex. Crim. App. 1997).

Here, the uncontroverted evidence established that Detective Hernandez did not discuss the case with juror number five, nor did he say anything prejudicial to Garcia during

---

[6] On appeal, Garcia argues that he was "denied a fair and impartial trial and due process of law when the court failed to remove Juror no. 5" and cites the standard of review applicable to a motion for mistrial. However, Garcia did not move for a mistrial at trial, nor did he object that his constitutional rights were being denied.  He has therefore not preserved these issues for appeal.  *See* TEX. R. APP. P. 33.1.

his conversation with the juror. Any presumption of injury was rebutted by this evidence.[7] *See Green*, 840 S.W.2d at 406. Viewing the evidence in the light most favorable to the ruling, *see Quinn*, 958 S.W.2d at 401-02, we conclude that the trial court did not abuse its discretion by denying Garcia's request to remove juror number five. Accordingly, Garcia's fourth issue is overruled.

## E.    Ineffective Assistance of Counsel

By his fifth issue, Garcia claims that he received ineffective assistance of counsel at trial. To establish a claim for ineffective assistance, Garcia must show (1) his attorney's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for his attorney's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 664, 668 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.). Whether this test has been met is to be judged on appeal by the totality of the representation, not by any isolated acts or omissions. *Jaynes*, 216 S.W.3d at 851. The burden is on the appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Id.* Our review of counsel's representation is highly deferential, and we will find ineffective assistance only if the appellant overcomes the strong presumption that her counsel's conduct fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. Further, the acts or omissions that form the basis of appellant's claim of ineffective assistance must be evidenced by the record. *See Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999); *Jaynes*, 216 S.W.3d at 851. In most cases, a silent record which provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App.

---

[7] Garcia argues that, had his counsel not become aware of the conversation, it would have remained "secretive." According to Garcia, "[t]hat makes this conversation and behavior by the juror suspect and puts the juror's and the officer's credibility at issue." Garcia cites no authority for these arguments, and we are not persuaded by them. *See* TEX. R. APP. P. 38.1(i).

2001); *Thompson*, 9 S.W.3d at 813-14.

Garcia complains of several different actions and inactions by his trial counsel. Specifically, Garcia argues that his trial counsel was ineffective because: (1) he "fail[ed] to adequately prepare for trial and present a plausible defense"; (2) he "fail[ed] to object to [i]nadmissible evidence"; (3) he objected to the consolidation of the case with another case against Garcia alleging arson and tampering with physical evidence, *see* TEX. PENAL CODE ANN. §§ 28.02, 37.09 (Vernon Supp. 2009); (4) he "failed to strike" a potential juror; and (5) he made three separate errors during the punishment phase of trial. We will address each allegation in turn.

### 1.    Failure to Prepare for Trial and Present a Plausible Defense

First, Garcia contends that his trial counsel "fail[ed] to adequately prepare for trial" and "did not offer to the jury any plausible defense." He argues that his counsel waited until one week before trial to request a witness list from the State, even though it had been fifteen months since Garcia was arraigned. However, as the State notes, the record reflects that defense counsel was engaged in discovery long before obtaining the witness list from the State. In any event, Garcia does not point to any evidence in the record, other than his own self-serving statements made in an affidavit attached to his motion for new trial, establishing that his counsel did not investigate the law and facts of the case. *See Thompson*, 9 S.W.3d at 814 (noting that claims of ineffective assistance of counsel must be evidenced by the record); *see also McFarland v. State*, 928 S.W.2d 482, 501 (Tex. Crim. App. 1996) (noting that "counsel is charged with making an independent investigation of the facts of the case").

Garcia also complains that his counsel never requested that the DNA samples obtained from Gonzalez be submitted for laboratory analysis. However, Detective Hernandez testified that Gonzalez, a "person of interest" with respect to De Leon's murder, came to the police station voluntarily to be interviewed, that Gonzalez was cooperative, and that police did not find any scratches on Gonzalez. Therefore, Garcia has not shown that,

23

if his counsel had in fact requested that Gonzalez's DNA samples be submitted for analysis, the result of the proceeding would have been any different. *See Strickland*, 466 U.S. at 668; *Hernandez*, 726 S.W.2d at 57; *Jaynes*, 216 S.W.3d at 851. We note further that counsel's decision not to request analysis of Gonzalez's DNA samples may have been the product of a valid trial strategy, because negative results from such testing would have been severely detrimental to Garcia's defensive theory. *See Skinner v. State*, 293 S.W.3d 196, 203 (Tex. Crim. App. 2009) (finding no showing of ineffective assistance where record supported conclusion that counsel's failure to seek DNA testing was "a matter of sound trial strategy").

### 2. Failure to Object to Inadmissible Evidence

Garcia next complains that his trial counsel failed to (1) move for suppression of evidence seized "while [Garcia] was being detained," and (2) object to testimony establishing that Garcia refused to voluntarily provide his clothes to police officers.

To establish an ineffective assistance claim based on counsel's failure to move for suppression of evidence, an appellant must show that the motion would have been granted. *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998). Citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968), Garcia argues that the search which produced this evidence was not incident to a lawful arrest and therefore only a pat-down or frisk was authorized. However, the record does not support this interpretation of events. Under the Texas Code of Criminal Procedure, a warrantless arrest may be made "[w]here it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant . . . ." TEX. CODE CRIM. PROC. ANN. art. 14.04 (Vernon 2005). Here, Detective Cavazos testified that he was assigned to locate Garcia after De Leon's vehicle was found abandoned. Police knew at the time that De Leon had been murdered, that her body had been set on fire, and that Garcia was one of the last people to see De Leon alive. Detective Cavazos located Garcia based on information obtained from Janell,

and he "immediately" smelled smoke on Garcia's person, saw smoke residue around Garcia's ears and neck, and saw scratches on Garcia's face and neck. Based on this information, Detective Cavazos was authorized to arrest Garcia without a warrant. *See id.* Accordingly, Garcia has not shown that a motion to suppress evidence obtained incident to his lawful arrest would have been granted. *See Jackson*, 973 S.W.2d at 957; *Strong v. State*, 138 S.W.3d 546, 555 (Tex. App.–Corpus Christi 2004, no pet.) ("[T]he rule is well-established that failure to obtain a search warrant is excusable under both the United States and Texas Constitutions where the search is incident to a lawful arrest."); *State v. West*, 20 S.W.3d 867, 871 (Tex. App.–Dallas 2000, pet. ref'd) ("A search incident to a lawful arrest requires no additional justification.").

### 3.     Objection to Consolidation of Murder and Arson Cases

Garcia next argues that his trial counsel was ineffective because he objected to the State's request to consolidate the underlying case with a separate case in which Garcia was accused of arson and tampering with physical evidence in connection with the same criminal episode. Garcia argues that "the primary evidence against [him] was concerning the arson," and contends that his trial counsel "should have allowed the consolidation so that the jury had the option to convict [him] of arson and find him not guilty as to murder." However, as the State correctly notes, "murder and arson are distinct offenses[,] each containing elements not found in the other, meaning that there was no legal impediment or jeopardy issue which would prevent [Garcia] from being convicted and sentenced for both offenses" even if the arson and murder cases were consolidated. *See* TEX. PENAL CODE ANN. §§ 19.02, 28.02. Garcia has therefore not shown that, but for his counsel's objection to consolidation, the result of the murder trial would have been different. *See Strickland*, 466 U.S. at 668; *Hernandez*, 726 S.W.2d at 57; *Jaynes*, 216 S.W.3d at 851.

### 4.     Failure to "Strike" Prospective Juror

Garcia further contends that his trial counsel erred by failing to exercise a peremptory challenge against a prospective juror, because that juror was related to one

of the witnesses.[8]  Garcia argues that "[t]here would not be any plausible jury strategy to allow this to happen."  However, Garcia does not allege on appeal that, had his trial counsel used a peremptory challenge on this prospective juror, there is a reasonable probability that the result of the proceeding would have been different.  *See Strickland*, 466 U.S. at 668; *Hernandez*, 726 S.W.2d at 57; *Jaynes*, 216 S.W.3d at 851.

### 5. Punishment Phase Errors

Garcia next alleges that his trial counsel made three errors during the punishment phase of trial.  He first asserts generally that his counsel "was wholly ineffective in the punishment phase," primarily because he called only one witness, Janell, to testify on his behalf.  Garcia claims that "[t]he complete lack of mitigating or punishment evidence presented on [his] behalf is clearly ineffective considering the gravity of the charges and the length of the trial."  Garcia does not, however, point to any specific "mitigating or punishment evidence" that his counsel could have presented, but chose not to.  He has not met his burden to establish ineffective assistance of counsel on these grounds.

Second, Garcia contends that his trial counsel erred when, during closing argument at the punishment phase, counsel stated as follows:

> I'm asking you to think of what lies ahead for Gabriela's family, what lies ahead for the family of Mr. Garcia.  Is he a person who is worthy of receiving a 10-year sentence, a 20-year sentence, a 30-year sentence, where it tells you that he'll serve one-half the time?  One-half the time before he's eligible for parole.  At the age of 31, if you're given a 30-year sentence and you serve half the time, it's about 45.  And it doesn't mean that you're going to get out.  It just means you're eligible for parole.  Your conduct drives whether you get out or not.  If he has disagreements in 30 years, he's going to be 30 years inside.  He'll be 60.  At 30 years, if he does everything he's supposed to, he'll be out at 45.  At 30 years, if he doesn't do what he's supposed to, he'll be out at 60.  At 60.

Garcia argues that his "counsel's assertions to the jury regarding the actual amount of time to be served are completely misleading and detrimental to [Garcia]."  However, the remarks

---

[8] The juror referenced by Garcia in this sub-issue is the same juror that had a brief discussion with a witness, Detective Hernandez.  *See infra* section III.D.  The juror stated in voir dire that she is Detective Hernandez's cousin.

were consistent with the charge of the court as to sentencing, which informed the jury that it "may consider the existence of the parole law and good conduct time" in arriving at its decision. It is true that counsel was not entirely accurate in setting forth the law as to parole—the jury charge stated that, if a term of imprisonment is imposed, Garcia will not become eligible for parole "until the actual time served equals one-half of the sentence imposed *or 30 years, whichever is less* . . ." (emphasis added). Nevertheless, we cannot say that counsel's performance in making these remarks fell outside the "wide range of reasonable professional assistance." *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851.

Finally, Garcia contends that his counsel erred by failing to object to the prosecutor's statement in closing argument that De Leon's "blood was all over [Garcia's] clothes," noting that the evidence merely established that De Leon's *DNA* was all over Garcia's clothes. We cannot say that, had defense counsel objected to this language, there is a reasonable probability that the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 668; *Hernandez*, 726 S.W.2d at 57; *Jaynes*, 216 S.W.3d at 851.

We overrule Garcia's fifth issue.

## F.    Notice of Evidence of Prior Conviction

By his sixth issue, Garcia contends that the trial court erred during the punishment phase by admitting, over objection, evidence of Garcia's prior conviction for aggravated assault. Garcia specifically argues that the evidence should have been excluded because the State did not provide "reasonable notice" of its intent to offer such evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g).

Here, Garcia filed a request for notice under article 37.07 on September 13, 2006. The State did not file its initial response to that request until April 5, 2007, eleven days before trial was set. When the State offered its extraneous offense evidence at trial, defense counsel objected, arguing that the State's prior notice misstated the cause number

27

and date of the extraneous offense and did not state the name of a victim.[9] The trial court overruled the objection and admitted the evidence.

We review the admission of extraneous offense or bad act evidence for an abuse of discretion. *Mitchell v. State*, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996). The purpose of article 37.07, section 3(g) is to avoid unfair surprise and to enable a defendant to prepare to answer the extraneous offense evidence. *Luna v. State*, 301 S.W.3d 322, 326 (Tex. App.–Waco 2009, no pet.) (citing *Apolinar v. State*, 106 S.W.3d 407, 414-15 (Tex. App.–Houston [1st Dist.] 2003), *aff'd on other grounds*, 155 S.W.3d 184 (Tex. Crim. App. 2005); *Roethel v. State*, 80 S.W.3d 276, 282 (Tex. App.–Austin 2002, no pet.); *Nance v. State*, 946 S.W.2d 490, 493 (Tex. App.–Fort Worth 1997, pet. ref'd)). This analysis requires examining the record to determine whether the deficient notice resulted from prosecutorial bad faith or prevented the defendant from preparing for trial. *Id.* (citing *Roethel*, 80 S.W.3d at 282). In determining the latter, we look at whether the defendant was surprised by the substance of the testimony and whether that affected his ability to prepare cross-examination or mitigating evidence. *Id.*

Assuming, but not deciding, that the State's notice was in fact deficient, we nevertheless note that Garcia has not established that he was surprised by the substance of the extraneous offense evidence, nor has he shown that his ability to prepare his case was detrimentally affected by the admission of that evidence.[10] *See id.* Moreover, Garcia has not directed us to anything in the record indicating that the State's tardiness in providing notice pursuant to his request, or the errors in the notice itself, were the result of prosecutorial bad faith. *See id.* Accordingly, we conclude that the trial court did not abuse

---

[9] We note that the statute requires the State's notice to contain "the date on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act" only where the State "intends to introduce an extraneous crime or bad act *that has not resulted in a final conviction* in a court of record or a probated or suspended sentence." TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g) (Vernon Supp. 2009) (emphasis added). Here, the extraneous offense evidence offered by the State was a final conviction for aggravated assault.

[10] It is noteworthy that, according to the extraneous offense judgment admitted into evidence, one of Garcia's attorneys in the instant case also represented him in the prior aggravated assault case.

its discretion by overruling Garcia's objection to the State's extraneous offense evidence. His sixth issue is overruled.

## IV. Conclusion

Having overruled all of Garcia's issues on appeal, we affirm the judgment of the trial court.

_____
DORI CONTRERAS GARZA
Justice

Do not publish.
Tex. R. App. P. 47.2(b)
Delivered and filed the
31st day of August, 2010.